**FOR PUBLICATION**

Order Filed on April 6, 2021
by Clerk,
U.S. Bankruptcy Court
District of New Jersey

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| _____ : | |
| In re: | : |
| | : CHAPTER 11 |
| One2One Communications, LLC, | : |
| Debtor. | : |
| | : CASE NO.:    12-27311 (SLM) |
| | : |
| _____ : | |

**AMENDED OPINION[1]**

**APPEARANCES:**

Richard D. Trenk, Esq.
Henry M. Karwowski, Esq.
Trenk, DiPasquale, Della Fera & Sodono, P.C.
347 Mount Pleasant Avenue
Suite 300
West Orange, NJ 07052
*Counsel for Debtor,*
*One2One Communications, LLC*

Michael M. Schmahl, Esq.
Mason, Pollick & Schmahl, LLC
1319 N. Wood Street
Suite 3B
Chicago, IL
*Counsel for Debtor,*
*One2One Communications, LLC*

Courtney A. Schael, Esq.
Ashford Schael, LLC
100 Quimby Street, Suite 1
Westfield, NJ 07090
*Counsel for Creditor, Quad/Graphics, Inc.*

Timothy F. Nixon, Esq.
Godfrey & Kahn, S.C.
333 Main St., Suite 600
P.O. Box 13067
Green Bay, WI 54307
*Counsel for Creditor, Quad/Graphics, Inc.*

---

[1] The Opinion is amended for the sole purpose of adding counsel of record to the caption.  The substance and body of this Opinion were not altered.

**STACEY L. MEISEL, UNITED STATES BANKRUPTCY JUDGE**

## INTRODUCTION

This matter is before the Court on a motion filed by Quad/Graphics, Inc. ("Quad") to reopen the chapter 11 bankruptcy case pursuant to 11 U.S.C. § 350[2] and seeking derivative standing to pursue alleged causes of action on behalf of creditors (the "Motion").[3]  The Reorganized Debtor, One2One Communications, LLC (referred to as either the "Debtor" or, after confirmation, the "Reorganized Debtor") opposes the Motion.  The Court reviewed fully the submissions of the parties—including the supplemental pleadings—and considered the arguments set forth on the record during the hearings on September 26, 2017 and October 4, 2017.  For the reasons set forth below, the Court finds and concludes that Quad fails to set forth a legal basis or equitable grounds to reopen this case.  The Motion is denied.

## JURISDICTION AND VENUE

This Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended September 18, 2012, referring all bankruptcy cases to the bankruptcy court.  This Court has jurisdiction to consider a motion to reopen a closed case pursuant to 11 U.S.C. § 350(b) and FED. R. BANKR. P. 5010.[4]  This matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) as it concerns the administration of the estate. Venue is proper in this Court under 28 U.S.C. § 1408.

---

[2] Unless otherwise noted, all statutory citations will refer to title 11 of the United States Code.
[3] Docket No. 409.
[4] Unless otherwise noted, all procedural citations will refer to the Federal Rules of Bankruptcy Procedure.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The factual background and procedural history of this matter are complex. They are well known to the parties and will not be repeated in detail here. In relevant part, the Debtor filed its voluntary petition for relief under chapter 11 of the United States Bankruptcy Code on July 10, 2012.[5] On July 31, 2012, the Office of the United States Trustee formed an official unsecured creditors' committee (the "Committee") of which Quad was a member.[6] On January 25, 2013, after filing earlier drafts of proposed plans of reorganization that failed to confirm, and following negotiations with the Committee, the Debtor filed its *Fourth Disclosure Statement* and *Fourth Chapter 11 Plan* (the "Plan").[7] Pursuant to the Plan, a new entity known as One2One Holdings, LLC, a newly formed limited liability company owned and controlled by an outside investor, would acquire the membership interest in the Reorganized Debtor.[8] The Plan also provided for the release of actions against insiders and certain third parties.[9] Quad objected to confirmation of the Plan.

The confirmation hearing in this case began on February 13, 2013 (the "Confirmation Hearing") before the Honorable Novalyn L. Winfield, U.S.B.J (Retired). On February 25, 2013, after several days of hearings, Judge Winfield issued an oral decision confirming the Plan subject to corrections.[10] The details of the positions taken, evidence presented, and findings made during the Confirmation Hearing will be discussed below as they pertain to the parties' arguments in the instant Motion.

---

[5] Docket No. 1.
[6] Docket No. 37.
[7] Docket Nos. 206 & 207.
[8] *Id.*
[9] *Id.* at 29-31.
[10] Docket No. 252, Conf. Tr., Feb. 25, 2013.

Shortly after Judge Winfield's oral ruling, Quad filed a motion for stay pending appeal.[11] Judge Winfield denied Quad's motion for a stay pending appeal and confirmed the Debtor's Plan on March 4, 2013 (the "Confirmation Order").[12]  On March 18, 2013, Quad filed a *Notice of Appeal of the Confirmation Order* and a *Notice of Appeal of the Order Denying Motion for Stay* (collectively, the "Appeal").[13]  The following day, Quad filed a motion for stay and other relief in the district court.[14]  On March 20, 2013, the district court entered an Order denying Quad's motion for a stay and other relief.[15]  On June 7, 2013, the Debtor then filed a motion in the district court seeking to dismiss Quad's Appeal as equitably moot.[16]  On July 24, 2013, the district court entered an Order granting the Debtor's motion and dismissed Quad's Appeal as equitably moot.[17]  Quad filed a *Notice of Appeal* of the district court's *Order on Motion to Dismiss* to the Third Circuit Court of Appeals.[18]

While Quad's appeal to the Third Circuit was pending, litigation and negotiation between the parties continued.  On July 10, 2014—the date on which the statute of limitations for avoidance actions expired—Quad filed a *Motion for Order Granting Derivative Standing to Pursue Avoidance Actions and Extending the Time Periods Under 11 U.S.C. §§ 108 and 546(a) for Filing Actions Pursuant to Federal Rule of Bankruptcy Procedure 9006(b)(1)* (the "First Derivative Standing Motion").[19]  In the First Derivative Standing Motion, Quad sought

> an order granting Quad derivative standing to pursue actions released under the Plan to the extent Quad is successful on the pending appeals and to extend the time

---

[11] Docket No. 258.
[12] Docket No. 271.
[13] Docket No. 290.
[14] District Court Case No. 13-cv-1675, Docket No. 1.
[15] District Court Case No. 13-cv-1675, Docket No. 5.
[16] District Court Case No. 13-cv-1675, Docket No. 34.
[17] District Court Case No. 13-cv-1675, Docket No. 49.
[18] District Court Case No. 13-cv-1675, Docket No. 50.
[19] Docket No. 378.

periods for bringing actions under sections 108 and 546(a) of the Bankruptcy Code until 90 (ninety) days after entry of a Final Order on the appeals.[20]

Quad explained that it objected to the releases, in part, because of inadequate consideration and that, according to its expert report, the causes of action released under the Plan had "significant value."[21]  Judge Winfield denied the First Derivative Standing Motion in an Order dated August 7, 2014 (the "First Denial Order").[22]  Quad never appealed the First Denial Order.  On May 11, 2015, the bankruptcy case was closed.[23]

On July 21, 2015, the Third Circuit determined that the district court abused its discretion in dismissing Quad's Appeal as equitably moot and reversed the district court's judgment.[24]  The Third Circuit remanded the case to the district court to consider the merits of Quad's Appeal.[25] On June 14, 2016, the district court rendered its decision on Quad's Appeal and entered an Order reversing Judge Winfield's approval of the releases and remanding the matter to this Court for further consideration (the "Remand Order").[26]

On June 6, 2017, this Court held a status conference on the matters remanded by the district court during which the Debtor agreed to forego consideration of the issues remanded.  The Court entered a *Stipulation and Consent Order on Remand from Appeal to District Court* (the "Consent Order on Remand") memorializing the parties' agreement, and the district court's invalidation of the releases became final.[27]  The Consent Order on Remand left the remainder of the Confirmation Order intact and did not reference any other orders of the Court.

---

[20] *Id.* at 3.
[21] *Id.* at 2, ¶4.
[22] Docket No. 386.
[23] Docket No. 395.
[24] Docket No. 398.
[25] *Id.*
[26] Docket No. 399.
[27] Docket No. 407.

On August 15, 2017, Quad filed the instant Motion.[28]  In the Motion, Quad cites to its expert report—previously submitted in connection with its opposition to confirmation—which concludes that the causes of action relating to insiders (the "Actions") have significant value.[29] Quad asserts that the bankruptcy case must be reopened to pursue and liquidate the Actions for the benefit of creditors, and Quad seeks derivative standing to do so.[30]  The Reorganized Debtor opposes the Motion on multiple grounds, discussed below.  The Court entertained oral argument on the Motion on September 26, 2017 and October 4, 2017 and the parties engaged in substantial briefing.[31]

## **DISCUSSION**

The unique procedural posture and complex timeline of events in this case—including concurrent motions and appeals before different courts—preclude a simple ruling on the merits of Quad's Motion.  The parties' attempts at answering questions during the hearings on this matter, held on September 26, 2017 and October 4, 2017, resulted in more unanswered questions.  As discussed with the parties on the record, the Court had reservations as to Quad's ability to bring the instant Motion given the express terms of the Consent Order on Remand.  The Court also had concerns relating to timeliness, statute of limitation issues, and the merits of Quad's Motion given the Confirmation Order and Judge Winfield's First Denial Order.  On October 10, 2017, the Court directed the parties to provide additional briefing to address these issues ("Order Continuing Motion to Reopen").[32]  After full consideration of the parties' submissions and relevant law, the Court's concerns remain.  For the reasons set forth below, Quad's Motion fails.

---

[28] Docket No. 409.
[29] Docket No. 409-2 at 4.
[30] *Id.* at 5.
[31] *See* Docket Nos. 409, 413, 414, 415, 418, 419, 420, and 421.
[32] Docket No. 416.

## I.    Effect of the Final Decree (Docket No. 395)

As set forth above, of the Court entered an Order on May 11, 2015 closing the bankruptcy case (the "Final Decree").[33]  The Final Decree explicitly contemplates Quad's Appeal of the Confirmation Order to the district court[34] and provides the following language in Paragraphs Two and Three:

> 2.  Upon the filing of a notice with the Court by either Quad or the Reorganized Debtor no later than sixty (60) days after a final order is entered reversing the Confirmation Order and/or remanding the Appeal (including any subsequent appeals) to this Court, the Chapter 11 Case shall be reopened, and "cause" as used in Section 350(b) of the Bankruptcy Code shall be deemed to exist. . . .
>
> 3.  Entry of this Order is without prejudice to the rights of the Reorganized Debtor or any other party in interest to seek to reopen the Chapter 11 Case for good cause shown pursuant to Section 350(b) of the Bankruptcy Code.[35]

The Appeal was remanded to this Court by way of the district court's Remand Order entered on June 13, 2016.[36]  The instant Motion, however, was not filed until August 15, 2017,[37] well beyond the sixty-day time frame set forth in Paragraph Two of the Final Decree.  During the hearings on this Motion, the Court characterized the effect of Final Decree as a threshold issue—potentially precluding Quad's ability to bring the Motion in the first instance—and the parties were asked to brief the matter.[38]  Only Quad addressed this issue in its supplemental submissions and the topic received little attention.[39]

In sum, Quad asserts that the Final Decree "does not preclude this Court from reopening the Bankruptcy Case and granting the relief requested by Quad."[40]  Specifically, Quad explains

---

[33] Docket No. 395.
[34] Docket No. 395 at 2.
[35] *Id.* at 3.
[36] Docket No. 399.
[37] Docket No. 409.
[38] Docket No. 416.
[39] Docket No. 419 at 26.
[40] *Id.*

that it is not seeking to reopen the case under Paragraph Two of the Final Decree.  Rather, Quad

cites to Paragraph Three of the Final Decree, which permits "any party in interest to file a motion

to reopen . . . for good cause shown."[41]  Under Quad's suggested interpretation of the Final Decree,

if Quad filed a notice within sixty days of the order remanding the Appeal, then pursuant to

Paragraph Two the case would have been "automatically reopened and cause deemed to exist."[42]

However, because the instant Motion was filed beyond the sixty-day limit, Quad asserts that

Paragraph Two is not implicated.  Instead, Quad contends that it moves to reopen under Paragraph

Three wherein cause is not automatically deemed to exist.  But, like any other interested party,

Quad must demonstrate good cause.   The Court rejects Quad's interpretation.

As an initial matter, a bankruptcy court has broad discretion to interpret—and even

reconsider—its own order.[43,44]  In exercising this broad discretion, this Court views Paragraph

Two of the Final Decree as bringing finality to this case with respect to any issues affected by the

district court's ruling on Quad's Appeal.   This Court makes this determination based on the

language of the Final Decree, principles of interpretation used in analogous circumstances, the

record of this case, and history of this action.

---

[41] Docket No. 395 at 3.

[42] Docket No. 419 at 26.

[43] *See, e.g.*, *In re G-I Holdings, Inc.*, 472 B.R. 263, 280 (Bankr. D.N.J. 2012) (collecting cases and citing *Rodriguez v. EMC Mortgage Corp. (In re Rodriguez),* 252 F.3d 435, at *2 (5th Cir. Mar. 15, 2001) (per curiam)).

[44] This Court acknowledges that Judge Winfield issued the Final Decree and has since retired.  Nevertheless, under the circumstances of this case it is both appropriate and within this Court's authority to interpret an order issued by another judge. *See, e.g.*, *See Alley v. U.S. Dep't of Health & Human Servs.*, 590 F.3d 1195, 1202 (11th Cir. 2009) (observing that—due to the passage of time—a new judge may be asked to interpret an order issued many years before by a different judge.); *see also In re China Peak Resort*, 76 B.R. 757, 759 (B.A.P. 9th Cir. 1987), *aff'd and remanded,* 847 F.2d 570 (9th Cir. 1988), *vacated sub nom. California State Bd. of Equalization v. Sierra Summit, Inc.*, 490 U.S. 844, 109 S. Ct. 2228, 104 L. Ed. 2d 910 (1989) (discussing factors to be considered when determining which court should make the interpretation including, but not limited to: efficiency; consistency or accuracy in the interpretation; and responsibility of the issuing court); *Garcia v. Chrysler Grp. LLC*, No. 12-1797, 2015 WL 12857080, at *4 (D.N.J. Mar. 9, 2015).

First, the introductory paragraph of the Final Decree explicitly mentions the pending Appeal—indicating the parties gave due consideration to the potential effects of a remand when they constructed the terms of the Final Decree. Indeed, Paragraph Two is devoted to the procedure that should be followed if and when the Appeal results in a remand of issues to the Bankruptcy Court. The plain meaning of the language in Paragraph Two indicates that its purpose was to place a sixty-day time limit on Quad's and the Reorganized Debtor's ability to reopen the case to address any remanded issues. Paragraph Two specifically deals with Quad, the Reorganized Debtor, and the Appeal, suggesting that Paragraph Three was designed for everyone and anything else. If, as Quad suggests, Quad could move under Paragraph Three to reopen the case to address remanded issues beyond the sixty-day timeframe, then this Court is hard pressed to understand Paragraph Two's purpose. The Court does not accept Quad's assertion that the difference between Paragraph Two and Three is simply that Paragraph Two relieves Quad of the obligation to show good cause. Rather, this Court reads Paragraph Two as explicitly setting forth the mechanism for reopening the case with respect to issues remanded as a result of the Appeal; whereas Paragraph Three serves as the "catch-all," allowing parties in interest to pursue their rights with respect to any *other* issues upon a showing of good cause.

This Court's interpretation is consistent with principles of interpretation and canons of construction in other contexts. Namely, the Third Circuit established that where "the terms of a contract cannot be reconciled, the more specific terms control over the general."[45] Likewise, with regard to statutory interpretation, it is well-settled that specific terms will prevail over general language covering the same subject matter.[46] Here, Paragraph Two explicitly references the

---

[45] *Citisteel USA, Inc. v. Gen. Elec. Co.*, 78 F. App'x 832, 837 (3d Cir. 2003).
[46] *See Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 111 S. Ct. 1156, 113 L. Ed. 2d 95 (1991); *see also City of Philadelphia v. Attorney Gen. of United States*, 916 F.3d 276, 288–89 (3d Cir. 2019), *reh'g*

Appeal. It sets forth a specific procedure—including a time limitation and a cost-bearing provision—to be utilized when reopening the case to address any remanded issues. Although Paragraph Three also addresses reopening the case, it consists of standard, "boilerplate" language without reference to specific parties or a specific purpose for reopening. Thus, with respect to the issues remanded as a result of the Appeal, this Court finds that the specific procedural terms of Paragraph Two prevail over the more general procedure provided for in Paragraph Three.

Finally, the record in this case suggests that this Court's interpretation of the Final Decree is consistent with the parties' and the Bankruptcy Court's understanding at the time. The Final Decree was entered as a result of a motion filed by the Debtor.[47] Quad did not file any opposition to that motion. If Quad wished to avoid the time limitations imposed by Paragraph Two, it could have—and indeed should have—submitted opposition along with an alternate proposed form of order.[48] The record additionally demonstrates that Quad was cognizant of the statute of limitations and understood the importance of extending deadlines to preserve its right to bring the actions. Indeed, one of Quad's stated purposes for bringing the First Derivative Standing Motion was to secure an order extending the time to bring avoidance actions "until 90 (ninety) days after entry of a Final Order on the appeals."[49] The Court denied this request. Quad failed to appeal that ruling

---

*denied* (June 24, 2019) (noting that "the principle of *ejusdem generis* teaches that the general term should be understood as a reference to subjects akin to the one with specific enumeration") (citation and quotation omitted); *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 583 (3d Cir. 2003) (Fuentes, dissent).

[47] Docket No. 392.

[48] The Court additionally notes that the Debtor submitted two different versions of the proposed final decree: one which contained just the time limitation, and another which contained both the time limit and a provision establishing that the Debtor would bear the costs of reopening in the event of a successful Appeal. *Compare* Docket No. 392-2 *with* Docket No. 392-3. The Bankruptcy Court ultimately opted to include the cost-bearing provision, indicating that consideration was given to the form of the order closing the case. This supports the Court's conclusion that Quad had an opportunity to argue for provisions in the Final Decree that would further protect its interests and failed to do so.

[49] Docket 378 at 3, ¶12.

and did not insert its proposed ninety-day extension into the Final Decree.[50]   Accordingly, it appears to this Court that Quad understood, and implicitly agreed to, the sixty-day time limit in Paragraph Two of the Final Decree.

For the foregoing reasons, this Court interprets the Final Decree as setting a limited window of time in which Quad or the Reorganized Debtor could seek to reopen the bankruptcy case to address any issues remanded as a result of the Appeal.  Quad failed to file a notice with this Court within sixty days of the district court's Remand Order.  Instead, Quad waited more than one year to file the instant Motion.  As a result, the Motion is precluded by Paragraph Two of the Final Decree and is denied on this basis.  Nevertheless, the Court will provide further discussion and alternate bases for denial of the Motion.

## II.      Standard for a Motion to Reopen

Section 350(b) of the Bankruptcy Code provides that "[a] case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause."[51]  "The moving party has the burden to demonstrate sufficient cause to reopen a bankruptcy case."[52]  The Third Circuit has stated that "bankruptcy courts have broad discretion to reopen cases after an estate has been administered," but has not set forth a specific test for determining when reopening a case is warranted.[53]  Rather, the appropriateness of reopening a case appears to depend upon the specific circumstances of the case.[54]  Courts in this circuit have also considered a non-

---

[50] The Court acknowledges that the relief requested in Quad's First Derivative Standing Motion sought a time limit on Quad's ability to bring an avoidance action whereas the Final Decree imposes a time limit on the filing of a motion to reopen the case.  This distinction is immaterial for purposes of this discussion as Quad's First Derivative Standing Motion is only referenced here to support this Court's conclusion that both Quad and the Bankruptcy Court understood that time limitations on the ability to address remanded issues were appropriate and necessary to bring finality to the case.

[51] 11 U.S.C. § 350(b); *see also* FED. R. BANKR. P. 5010.

[52] *In re Winburn*, 196 B.R. 894, 897 (Bankr. N.D. Fla. 1996) (citing *In re Geo Specialty Chemicals Ltd.*, 577 B.R. 142, 179 (Bankr. D.N.J. 2017)).

[53] *In re Zinchiak*, 406 F.3d 214 (3d Cir. 2005).

[54] *See Geo Specialty Chemicals*, 577 B.R. at 179; *In re Mattera*, 203 B.R. 565, 568 (Bankr. D.N.J. 1997).

exhaustive list of factors when ruling on a motion to reopen, including: (1) the length of time that

has passed; (2) whether any parties would be prejudiced if the case were or were not reopened; (3)

the availability of nonbankruptcy courts, such as state courts, to entertain the claim; and (4)

whether parties would be entitled to any relief after the case was reopened.[55]  Of those factors,

courts in this circuit have highlighted two of particular importance: timing and futility.[56]

With respect to timing, the inquiry can focus on two distinct time frames.  First, courts have

observed that "[w]hen deciding whether to reopen an estate, 'the length of time between the estate's

closing and the motion to reopen it should be of crucial significance to the bankruptcy court.' "[57]

Also significant, however, is the length of time that a party waits before filing a motion to reopen.[58]

In any event, the more time that passes before a motion to reopen is filed, the heavier the burden

becomes for demonstrating that reopening is warranted.[59]

When considering futility, this Court notes that, although the reopening of a bankruptcy

case is a purely ministerial act,[60] it provides the moving party with an opportunity to seek

substantive relief.[61]  Therefore, if the moving party cannot obtain the substantive relief which it

intends to seek, "then there is no reason to grant a motion to reopen."[62]

---

[55] *See Reinert v. Vara*, 620 B.R. 536, 543 (W.D. Pa. 2020) (citing *Redmond v. Fifth Third Bank*, 624 F.3d 793, 803 (7th Cir. 2010)); *In re Frazer/Exton Dev., L.P.*, 503 B.R. 620, 634–35 (Bankr. E.D. Pa. 2013) (citing *In re Janssen,* 396 B.R. 624, 634–35 (Bankr. E.D. Pa. 2008); *In re Padilla,* 365 B.R. 492, 503 (Bankr. E.D. Pa. 2007)); *see also In re Janocha*, No. 06-20191, 2015 WL 128152, at *3 (Bankr. W.D. Pa. Jan. 8, 2015).

[56] *See In re Geo Specialty Chemicals*, 577 B.R. at 179; *In re Figlio*, 193 B.R. 420, 425 (Bankr. D.N.J. 1996).

[57] *In re Geo Specialty Chemicals Ltd.*, 577 B.R. at 179 (citing *Stackhouse v. Plumlee (In re Plumlee),* 236 B.R. 606, 610 (E.D. Va. 1999) (internal citation omitted)).

[58] *See Redmond,* 624 F.3d at 799.

[59] *In re Geo Specialty Chemicals*, 577 B.R. at 178–79; *In re Figlio*, 193 B.R. at 425 (noting that debtor moved promptly to reopen the case, thus, laches did not apply to bar reopening).

[60] *In re Phillips*, No. 09-28759, 2012 WL 1232008, at *3 (Bankr. D.N.J. Apr. 12, 2012).

[61] *In re Frazer*, 503 B.R. at 635.

[62] *Reinert*, 620 B.R. at 543 ("A bankruptcy case should not be reopened where it would be a futile exercise or a waste of judicial resources." (citing *Redmond*, 624 F.3d at 803)).

With these factors in mind, this Court turns to the instant case.  For the reasons set forth below, this Court determines that Quad has not met its burden for showing that cause exists to reopen this bankruptcy case.

### A.  Quad Delayed 428 Days Before It Filed the Motion to Reopen

Here, the bankruptcy case was closed on May 11, 2015.[63]  Thus, the case was closed for more than two years before Quad filed its Motion.  Indeed, the Reorganized Debtor asserts, and Quad does not challenge, that the Plan has been fully consummated.  This Court acknowledges that the pending Appeal precluded Quad from filing the Motion to Reopen.  Accordingly, when addressing the timing factor, it is prejudicial to Quad to use the date the case closed as an operative date.  Rather, here the more appropriate time frame to consider is the length of time between the district court's Remand Order and Quad's Motion.

As discussed above, the Court finds that the Final Decree obligates Quad to file the instant Motion within sixty days of the date of the Remand Order.  Nevertheless, even if a specific time limit had not been prescribed and ignored, this Court finds the 428-day delay between the district court's Remand Order and Quad filing the instant Motion to be troublesome.  Quad fails to explain this lengthy passage of time, which supports the need for Quad to exhibit an even stronger showing of cause to reopen the case.

Although § 350 does not expressly establish a time period in which a motion to reopen must be filed, the majority of courts addressing the issue hold that "the request to reopen must be made within a 'reasonable' time, and what constitutes reasonableness is determined on a totality basis."[64]  A frequently cited case out of the Seventh Circuit, *Redmond v. Fifth Third Bank*, notes the following:

---

[63] Docket No. 395.
[64] *In re Welch*, No. 11-18277, 2015 WL 65307, at *4 (B.A.P. 9th Cir. Jan. 5, 2015) (collecting cases).

The passage of time weighs heavily against reopening. The longer a party waits to file a motion to reopen a closed bankruptcy case, the more compelling the reason to reopen must be. In assessing whether a motion is timely, courts may consider the lack of diligence of the party seeking to reopen and the prejudice to the nonmoving party caused by the delay.[65]

Here, the district court entered the Remand Order on June 13, 2016.[66]  Thus, the basis for Quad's Motion—the invalidation of the releases—came into existence on that date.  However, as the Reorganized Debtor points out,[67] Quad delayed more than 12 months before filing the Motion on August 15, 2017.[68]  In total, Quad waited 428 days after the district court remanded the case to the Bankruptcy Court before filing its Motion.  This Court considers that amount of time to be unreasonable.  In reaching this conclusion, this Court is guided by the decisions of other courts that have addressed the length of time that passed between the event that formed the basis of the motion and the filing of the motion to reopen—including those cases cited by Quad.[69]

The case law cited by the parties and this Court's own research reveals that diligence and timeliness on behalf of the moving party are necessary prerequisites to a successful motion to reopen.  A party cannot simply sit on his or her rights and delay filing a motion to reopen while other parties rely on the finality of the case.  To hold otherwise would allow cases with potentially

---

[65] *Redmond,* 624 F.3d at 799 (citations omitted).
[66] Docket No. 399-1 at 15.
[67] Docket No. 420 at 22.
[68] Docket No. 409.
[69] *See, e.g.*, *In re Welch*, No. 11-18277, 2015 WL 65307, at *2 (B.A.P. 9th Cir. Jan. 5, 2015) (denying motion to reopen where motion was filed seven months after the case was closed with no explanation for the delay); *cf In re Herzig*, 96 B.R. 264 (B.A.P. 9th Cir. 1989) (finding that motion to reopen could be granted where trustee filed motion less than three months after trustee learned of the event which triggered the ability to bring the motion); *In re Price*, 260 B.R. 653 (Bankr. W.D.N.Y. 2001) (allowing debtor to reopen case three months after it closed to amend schedules and initiate adversary proceeding and finding that the delay in amending the schedules was excusable due to a health problem that debtor's counsel had experienced); *In re Plumlee*, 236 B.R. 606, 611 (E.D. Va. 1999) (noting that although motion to reopen was filed five years after the bankruptcy closed, it was filed only four months after the event which triggered the motion to reopen); *In re Figlio*, 193 B.R. at 425 (noting that debtor moved promptly to reopen the case, thus, laches did not apply to bar reopening); *In re Alt*, 39 B.R. 902, 904 (Bankr. W.D. Wis. 1984) (granting motion to reopen where trustee acted in a timely fashion).

unresolved issues to languish indefinitely under constant threat of reopening.[70]  Indeed, one court

in this district stated that "[a]s a safeguard against bankruptcy cases existing in perpetuity, the

doctrine of laches operates as a bar against reopening a case."[71]  To balance the fairness to all

parties, courts have adopted a sliding scale, discussed earlier, when weighing a motion to reopen:

"[t]he longer the period between the closing and reopening, the more cause must be shown to

warrant a reopening."[72]  Here, Quad failed to adequately explain the 428-day lapse in time before

it took action.  In fact, Quad failed to provide any viable reason to counter its delay.[73]

Finally, the Court takes this opportunity to explain why it declines to use June 28, 2017, a

date suggested by Quad, as the operative date when examining the length of time that passed before

Quad filed the instant Motion.  On June 28, 2017, the parties entered into the Consent Order on

Remand, wherein the Debtor agreed to waive further consideration on remand.  As a result, the

district court's decision and order invalidating the releases and injunctions became final.[74]

Although Quad mentions this date in the context of its statute of limitations argument, Quad's

arguments indicate that it also advocates for use of this date in the Court's diligence analysis.

Namely, Quad asserts that "[i]t was not until after the appeal was finally resolved by entry of the

---

[70] *See In re Figlio*, 193 B.R. at 425.

[71] *Id.* (collecting cases); W*hite v. Boston,* 104 B.R. 951, 957 (S.D. Ind. 1989) (laches is defense to motion to reopen); *see also In re Reed*, 940 F.2d 1317, 1324 (9th Cir. 1991) (finding that facts did not amount to laches, although it was a defense to motion to reopen).

[72] *White,* 104 B.R. at 957–58 (citing *In re Penland*, 34 B.R. 536, 539 (Bankr. E.D. Tenn. 1983)); *see also In re Figlio*, 193 B.R. at 425 (balancing the "certainty afforded parties by finality against the benefits of full and proper administration of all assets").

[73] *See, e.g.*, *In re Welch*, 2015 WL 65307, at *2 (denying motion to reopen where motion was filed seven months after the case was closed with no explanation for the delay); *In re Dimogerodakis*, No. 04-23833, 2011 WL 1362342, at *6 (D.N.J. Apr. 11, 2011) (affirming bankruptcy court's denial of motion to reopen because the creditor sat on its rights); *cf In re Petty*, 93 B.R. 208, 213 (B.A.P. 9th Cir. 1988) (affirming the decision of the bankruptcy court permitting the reopening of a case to file an avoidance action, in part, because "once the facts were brought to the trustee's attention he was diligent in pursuing the matter").

[74] Docket No. 407.

[Consent Order on Remand] on June 28, 2017 . . . that the bar to bringing the Actions was lifted."[75] The Court disagrees.

The bar on Quad's Motion was imposed by the releases and injunctions approved in the Confirmation Order. So long as the releases and injunctions remained valid, Quad could not seek derivative standing to pursue the underlying causes of action. The district court, however, deemed those releases and injunctions invalid in its Remand Order dated June 13, 2016.[76] While the district court may have remanded the issue of Plan contributions for further analysis, the Remand Order does nothing to negate the fact that the releases were invalidated on June 13, 2016. Thus, as of June 13, 2016, nothing prevented Quad from filing the instant Motion. Quad could have, and indeed should have, taken immediate action to preserve its rights as soon as the relevant triggering event—the invalidation of the releases via the June 13, 2016 Remand Order—occurred. Instead, Quad delayed for more than twelve months. As previously discussed, the Court finds this delay unreasonable based on the terms of the Final Decree and the circumstances in this case.[77]

Quad places much emphasis on the fact that the Consent Order on Remand made the invalidation of the releases "final." That, according to Quad, was the triggering event for the Motion to Reopen.[78] However, for the reasons discussed above, the Court finds the triggering event for the Motion to Reopen to be the invalidation of the releases via the Remand Order as opposed to the Consent Order on Remand. The district court invalidated the releases. The Consent Order on Remand simply meant the parties would no longer litigate that invalidation.

---

[75] Docket No. 419 at 12; *see also* Docket No. 409-2 at 7 ("As a result of the Appeal and the Stipulation and Consent Order resolving the remand to the Bankruptcy Court, Quad's Motion is no longer premature.").

[76] Docket No. 399-1 at 15.

[77] *See, e.g.*, *In re Welch*, 2015 WL 65307, at *4–5 (affirming denial of creditor's motion to reopen because delay in filing the motion was significant).

[78] *See, e.g.*, Docket No. 419 at 12 ("It was not until after the appeal was finally resolved by entry of the [Consent Order on Remand] on June 28, 2017 that the bar to bringing the Actions was lifted."); Docket No. 409-2 at 4 ("As a result [of the Consent Order on Remand], the District Court's invalidation of the releases and injunctions of the Debtor's claim relating to insiders in the Debtor's Plan became final.").

This Court acknowledges that Paragraph Two of the Final Decree incorporates the term "final" and provides that notice shall be filed "no later than sixty (60) days after a final order is entered reversing the Confirmation Order and/or remanding the Appeal."[79]  In context, however, the use of "final" in this Paragraph can only mean a final order from the district court—not this Court.  In other words, the Final Decree refers to sixty days after the district court makes a final determination as to Quad's Appeal.  To hold otherwise would produce a nonsensical result and/or render Paragraph Two of the Final Decree meaningless.  The district court did not reverse the Confirmation Order and, instead, remanded the Appeal on June 13, 2016.  This Court has no authority to enter a "final order remanding the Appeal."  Therefore, the countdown triggered by Paragraph Two cannot rely on any action by this Court.  Had the Court or the parties intended to allow for an action to be brought sixty days after *this Court* issued a final ruling on any issues that were remanded by the district court, the Final Decree would have been worded to achieve that result.  If this had been Quad's intention, it could have negotiated for this language or, at the very least, filed a motion or other pleading with the Court seeking clarification as to the amount of time available to it.  Quad failed to do so.

### B.  Futility

As set forth above, "a closed bankruptcy proceeding should not be reopened where it appears that to do so would be futile and a waste of judicial resources."[80]  As discussed on the record during the hearings on September 26, 2017 and October 4, 2017, Quad was tasked with demonstrating that the Actions for which it seeks derivative standing are timely and would result in substantive relief that would benefit creditors.  Quad failed to fulfill its task.  Rather, this Court determines that the Actions for which Quad seeks derivative standing are barred by the statute of

---

[79] Docket No. 395.
[80] *In re Frazer*, 503 B.R. at 635 (internal quotation and citation omitted).

limitations and Quad's request for derivative standing is precluded by res judicata, collateral estoppel, and law of the case doctrine. Even assuming the relief sought is not prevented by time limitations or claim and issue preclusion doctrines, this Court finds that Quad's request for derivative standing would otherwise prove futile. Further, equity weighs in favor of denying the Motion.

### 1. Statute of Limitations

Based on Quad's representations, the Actions it seeks standing to pursue fall into two categories: actions arising under chapter 5 of title 11 of the Bankruptcy Code (the "Chapter 5 Actions") and actions arising under state law (the "State Law Actions"). This Court determines that both categories of actions are beyond the applicable statute of limitations absent equitable tolling.

With respect to the Chapter 5 Actions, the parties agree that the applicable statute to determine the limitations period is 11 U.S.C. § 546(a).[81] In relevant part, § 546(a) provides that an avoidance action may not be commenced after the earlier of either two years from the date the debtor filed the petition for relief[82] or the time the case is closed.[83] With regard to the State Law Actions, the parties agree that the time period set forth in 11 U.S.C. § 108 controls.[84] Under § 108, the statute of limitations for asserting the State Law Actions is the later of either two years after the date on which the petition was filed, or the expiration of the six-year period provided under state law.[85] In this case, the Debtor filed its petition for relief on July 10, 2012.[86] Thus, the two-year period under § 546(a)(1)(A) and § 108 expired on July 10, 2014. Additionally, any State Law

---

[81] See Docket No. 420 at 17 (agreeing that the asserted actions arise under chapter 5 of the Bankruptcy Code).
[82] § 546(a)(1)(A).
[83] § 546(a)(2).
[84] Docket No. 419 at 7; Docket No. 420 at 19.
[85] *See* N.J. STAT. ANN. 2A:14-1; *see also* Docket No. 419 at 7; Docket No. 420 at 19.
[86] Docket No. 1.

Action that accrued more than six years before the instant Motion was filed, or before August 15, 2011, is beyond the six-year statute of limitations prescribed by New Jersey statute.

The Reorganized Debtor asserts that, absent equitable tolling, nearly all of the actions that Quad seeks to commence are time-barred.[87]  The Reorganized Debtor further argues that Quad failed to satisfy any criteria which would entitle it to equitable tolling.[88]  Quad acknowledges the statute of limitations imposed by § 108 and § 546(a), but asserts that "[i]f the case is reopened, the time periods under sections 108(a) and 546(a)(1) of the Bankruptcy Code are further extended for the time period in which the case was closed."[89]  Although Quad does not state it directly, Quad implicitly concedes that unless equitable tolling applies, the statutes of limitations for both the Chapter 5 Actions and the State Law Actions have expired.[90]

In arguing the equitable tolling issue in this case, both parties rely primarily on out-of-circuit cases in support of their respective positions.[91]  Indeed, there appears to be a dearth of case law in this circuit regarding whether a statute of limitations should be equitably tolled during the pendency of an appeal and the effect that closing a case has on the ability to bring an avoidance action after remand of an appeal.  Therefore, this Court is mostly guided by persuasive out-of-circuit authority.  For the reasons that follow, the Court determines that equitable tolling of the statute of limitations is inappropriate given the circumstances of this case.

---

[87] The Reorganized Debtor asserts that only those State law Actions which accrued within six years of the date Quad filed the instant Motion, or no earlier than August 15, 2011, are not stale. Docket No. 420 at 19-20.
[88] Docket No. 413 at 14.
[89] Docket No. 419 at 9.
[90] Quad does not allege that any of the State Law Actions it seeks to file accrued within six years of the date the instant Motion was filed; nor does Quad expressly assert that any of the actions it seeks to file are timely absent equitable tolling.
[91] *See* Docket No. 419 at 7-14, Docket No. 420 at 17-20.

It is well established in the Third Circuit that equitable tolling of a limitations period is an extraordinary remedy that should be used sparingly.[92]  The Third Circuit recently explained that it "uses the term 'equitable tolling' broadly to encompass several situations under which a statute of limitations period may be tolled on equitable grounds."[93]  Namely, equitable tolling may be appropriate: (1) where a defendant has actively misled a plaintiff respecting the plaintiff's cause of action; (2) where a plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where a plaintiff has timely asserted his or her rights mistakenly in the wrong forum.[94]

Although Quad recognizes these enumerated situations in its briefing,[95] Quad fails to explicitly identify which of these situations applies to the present case.  Quad never alleges that the Debtor actively misled Quad,[96] or that Quad filed in the wrong forum.  The crux of Quad's argument is that it was prevented from bringing the Actions because the "Plan released the parties subject to the Action[s] and enjoined actions by creditors."[97]  Quad seemingly relies on the second element.  Presumably, Quad asserts that the Plan and the pending Appeal constitute an extraordinary circumstance, which precluded Quad from asserting its rights.  The Court agrees that Quad was prevented from filing the instant Motion to Reopen until the district court decided the Appeal.  This factor weighs in favor of equitably tolling the statute of limitations during the pendency of the Appeal.  But that is not the end of the inquiry.

---

[92] *See D.J.S.-W. by Stewart v. United States*, 962 F.3d 745 (3d Cir. 2020) (collecting cases); *Hedges v. United States*, 404 F.3d 744, 751 (3d Cir. 2005); *see also Peralta*, 599 B.R. 759, 768 (Bankr. D.N.J. 2019) (collecting cases).
[93] *D.J.S.-W.*, 962 F.3d at 750.
[94] *See Id.*; *Hedges*, 404 F.3d at 751.
[95] Docket No. 419 at 10-11.
[96] Although Quad alludes to "wrongful conduct" (*see* Docket No. 419 at 13), it does not assert that Debtor actively misled it.
[97] Docket No. 419 at 12.

To satisfy the second factor, a litigant must establish two elements: (1) some extraordinary circumstance stood in the litigant's way and prevented timely filing, and (2) the litigant has been pursuing his or her rights diligently.[98] The Third Circuit expressly stated that diligence is a distinct element, which must be satisfied for a litigant to be eligible for tolling.[99] Quad's own briefing recognizes this diligence requirement.[100] Quad also argues that it would be unfair to bar the actions it seeks to file "after Quad's extensive, costly, and time consuming efforts to preserve these Actions for the benefit of all creditors."[101] However, the record in this case simply does not reflect a diligent effort by Quad to preserve the right to bring these Actions.

As an initial matter, the Bankruptcy Court previously considered the issue of tolling when it addressed the First Derivative Standing Motion and denied Quad's request to extend the statute of limitations ninety days after a final ruling on the Appeal.[102] Quad filed the First Derivative Standing Motion on the same day that the statute of limitations was set to expire under § 108 and § 546(a)—evidencing that Quad understood the importance of preserving its rights. After considering Quad's arguments, Judge Winfield issued a thorough opinion denying Quad's request to extend the statute of limitations, noting that the request was unsupported by any facts warranting such relief.[103] Quad failed to appeal this ruling or to seek to alter or amend Judge Winfield's order.

Additionally, in a footnote in its First Derivative Standing Motion (the "Footnote") Quad indicated that it previously raised its concerns regarding time limitations to the district court in the

---

[98] *D.J.S.-W.*, 962 F.3d at 752; *Holland v. Fla.,* 560 U.S. 631, 649, 130 S. Ct. 2549, 2562, 177 L. Ed. 2d 130 (2010) (recognizing that a prerequisite for equitable tolling of a limitations period is a demonstration that the movant has been pursuing his rights diligently).

[99] *D.J.S.-W.*, 962 F.3d 745; *Hedges*, 404 F.3d at 751 (noting that a plaintiff must exercise due diligence in preserving his claim); *In re Insley*, 322 B.R. 272, 278 (Bankr. W.D. Pa. 2005) (observing that the limitations period imposed by § 546(a) will not be equitably tolled if the movant has not acted diligently enough); *In re Welch*, 2015 WL 65307, at *5 (noting that " equity assists the vigilant and diligent, not those who sleep on their rights") .

[100] Docket No. 419 at 19.

[101] Docket No. 419 at 11.

[102] Docket No. 378 at 3.

[103] Docket No. 386 at 9.

context of its request for a stay of the Confirmation Order.[104]  According to Quad, the district court

responded by explaining that equitable tolling applied to the relevant federal time limitations.[105]

Quad stated in the Footnote, however, that there was "no guarantee that a court would determine

that time limitations were equitably tolled after the time period ha[d] already expired."[106]  Quad

added that it was reserving "all of its rights, including, to assert equitable tolling."[107]  This Footnote

indicates that Quad understood the importance of preserving its rights with respect to the statute

of limitations.   Nevertheless, beyond filing the First Derivative Standing Motion, Quad took no

action whatsoever to preserve any rights and, in this Court's opinion, missed available

opportunities to do so.

    As discussed above, in April 2015, after the First Derivative Standing Motion was denied,

the Debtor filed a motion seeking to close the case.  Quad failed to oppose that motion.  The Court

entered the Debtor's proposed order submitted with the motion to close the case, resulting in the

Final Decree.[108]  Upon the filing of the motion seeking to close the case, Quad had an opportunity

to negotiate for inclusion of language in the Final Decree preserving its rights.  Quad declined to

act to preserve its rights by either opposing the motion or submitting an alternate proposed form

of order.

    The Court further notes that Quad voluntarily, and without any prompting from the Court,

executed the Consent Order on Remand with the Reorganized Debtor.[109]  By the terms of the

Consent Order on Remand, the parties agreed that this Court would not consider the issues

remanded, and the district court's invalidation of the releases became final.  Nothing in the Consent

---

[104] Docket No. 378 at 4, n.1.
[105] *Id.*
[106] *Id.*
[107] *Id.*
[108] Docket No. 392.
[109] Docket No. 407.

Order on Remand—which Quad negotiated and entered into voluntarily—protects Quad's ability

to commence the causes of action or otherwise addresses the timeliness of the claims that Quad

now seeks derivative standing to file.  If Quad wanted equitable tolling to apply to the statute of

limitations for the Actions, Quad could have—and indeed should have—included such language

in the Consent Order on Remand or made an appropriate application to the Court.

Finally, the Court again notes the 428-day delay between the Remand Order and Quad

filing the instant Motion.  As discussed above, the Court finds this delay to be unreasonable under

the circumstances of this case.  Significantly, Quad identifies the "pending appeals" as the reason

that the actions were equitably tolled.[110]  Yet, Quad delayed for 428 days after the Appeal was no

longer pending.  Quad fails to adequately explain why it declined to act sooner and this lengthy

period of inaction does little to nothing to evidence a diligent effort on Quad's part.  In sum, the

Court determines that Quad failed to diligently pursue its rights.  The Court, therefore, declines to

apply equitable tolling.[111]

The Court additionally notes that, in its supplemental briefing, Quad urges the Court to

exercise flexibility in employing equitable tolling.  Indeed, the Supreme Court in *Holland*

approved a flexible approach where rigid application of mechanical rules would prove unfair.[112]

Quad contends that "[i]t is hard to imagine a more unfair result than to time bar these Actions from

being brought for the benefit of creditors" and Quad asserts that this "unfair result would benefit

the insiders."[113]  The Court wholly rejects Quad's assertion that time barring these Actions

produces an unfair result.  As discussed, the Court finds that Quad failed to diligently pursue its

---

[110] Docket No. 419 at 9 ("[T]he limitations periods under sections 108(a) and 546(a)(1) of the Bankruptcy Code had not expired because they were equitably tolled as a result of the releases and injunctions in the Plan subject to the pending appeals.").
[111] *See D.J.S.-W.*, 962 F.3d at 752.
[112] *Holland*, 560 U.S. at 639; *D.J.S.-W*, 962 F.3d at 750.
[113] Docket No. 419 at 11.

rights.  Therefore, the Court does not consider it unfair to deny Quad the extreme remedy of equitable tolling and preclude Quad from pursuing claims that it failed to act to protect.  Equity does not permit this Court to resuscitate Actions, which Quad knowingly and willingly failed to preserve.

Moreover, the Court cannot examine fairness in a vacuum.  Rather, the Court must balance the fairness to Quad in affording Quad the ability to pursue these Actions with the fairness to other parties who have relied on the finality of the bankruptcy case. The Third Circuit has acknowledged a general public policy of affording finality to bankruptcy court judgments.[114]  Given the totality of the circumstances, and for reasons previously discussed, the Court determines that equitable tolling of the statute of limitations is inappropriate in this case.[115]  As a result, the Actions are untimely, and the futility of reopening the case compels denial of the Motion.[116]  Nevertheless, the Court will continue its analysis.[117]

---

[114] *See, e.g.*, *In re One2One Commc'ns, LLC*, 805 F.3d 428, 434 (3d Cir. 2015) (recognizing that affording finality encourages investors and others to rely on confirmation orders, and thereby facilitates successful reorganizations by fostering confidence in the finality of confirmed plan); *Nordhoff Investments, Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 190 (3d Cir. 2001); *In re Cont'l Airlines*, 91 F.3d 553, 560 (3d Cir. 1996); *In re Szostek,* 886 F.2d 1405, 1409 (3d Cir. 1989).

[115] The Court notes that Quad asserts that this Court should examine the equitable tolling argument under a motion to dismiss standard.  Quad cites *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1392 (3d Cir. 1994) for the proposition that it need only plead the applicability of equitable tolling to present a "colorable claim" for purposes of reopening and derivative standing.  Notwithstanding the fact that *Oshiver* is a dated case which was been overruled on other grounds, it does not help Quad's cause. Even accepting Quad's allegations as true and giving Quad the benefit of all reasonable inferences, Quad's allegations are insufficient to activate the doctrine of equitable tolling.

[116] *See, e.g.*, *In re Frazer*, 503 B.R. at 637 (finding that equitable tolling would not be applicable and, therefore, it would be futile to allow movant to reopen).

[117] As noted previously, Quad does not allege that any of the State Law Actions it seeks to bring accrued within six years of the date the instant Motion was filed; nor does Quad expressly assert that any of the actions it seeks to bring are timely absent equitable tolling.  Nevertheless, the Court acknowledges the possibility that there could exist State Law Actions for which the six-year statute of limitations has not run.  To the extent that these actions exist and are timely absent equitable tolling, the Court denies the instant Motion with respect to those State Law Actions on the alternative bases for denial, discussed herein.

### 2. Res Judicata

The doctrine of res judicata is fully applicable in bankruptcy cases.[118] It bars not only claims that were brought in a previous action, but also claims that could have been brought.[119] It "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation."[120] Three circumstances must be present for res judicata to apply: (1) a final judgment on the merits in a prior suit; (2) involving the same parties or their privies; and (3) a subsequent suit based on the same cause of action.[121] Res judicata is applicable to final orders issued by the bankruptcy court.[122]

Here, it is undisputed that the First Derivative Standing Motion involved the same parties as the instant Motion. Accordingly, the second prong required to invoke res judicata is present. However, Quad argues that Judge Winfield's First Denial Order is not a final judgment on the merits.[123] Quad additionally asserts that res judicata does not apply because the instant Motion is not "based on the same cause of action."[124] The Court will address each argument in turn.

### a. Final Judgment

In deciding when a court's decision becomes final in the bankruptcy context, the Supreme Court has acknowledged that the rules for finality are different in the bankruptcy realm than in

---

[118] *In re MRPC Christiana, LLC*, No. 18-26567, 2019 WL 6652237, at *13 (Bankr. D.N.J. Dec. 5, 2019) (Meisel, J.); *In re Galluzzo*, 2018 WL 4191476, at *22 (Bankr. D.N.J. Aug. 14, 2018) (Meisel, J.).
[119] *Duhaney v. Attorney Gen. of U.S.*, 621 F.3d 340, 347 (3d Cir. 2010); *see also MRPC Christiana*, 2019 WL 6652237, at *13 (citing *In re Mullarkey*, 536 F.3d 215, 225 (3d Cir. 2008)) (further citations omitted).
[120] *MRPC Christiana*, 2019 WL 6652237, at *13 (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979)).
[121] *Id.* (citing *Mullarkey*, 536 F.3d at 225) (further citations omitted); *Duhaney*, 621 F.3d at 347.
[122] *In re Target Indus. Inc.*, 328 B.R. 99, 115 (Bankr. D.N.J. 2005) (Gambardella, J.).
[123] Docket No. 419 at 15.
[124] Docket No. 419 at 17.

other areas of law.[125]  Unlike a typical civil case, a bankruptcy case can involve a multitude of issues and controversies, which require resolution by the bankruptcy court as a case progresses. The often complicated and concurrent controversies in a bankruptcy case require a different approach for determining when a decision by the bankruptcy court is final for purposes of an appeal.  Accordingly, the Supreme Court instructed in *Ritzen* that "[o]rders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete disputes within the overarching bankruptcy case."[126]  In this case, Quad contends that the First Denial Order is not final for two reasons.

First, Quad characterizes the First Denial Order as an "Extension Order."[127]  In the First Derivative Standing Motion, Quad also sought to "extend the time periods for bringing actions under sections 108 and 546(a) of the Bankruptcy Code."[128]  Thus, Quad asserts that the First Denial Order was an order entered on a motion for extension of time and was not final.[129]  Significantly, the Supreme Court in dicta has weighed in on the finality of bankruptcy courts' orders denying motions for extensions of time.  In *Bullard*, the Supreme Court indicated that the "concept of finality cannot stretch to cover, for example, an order resolving a disputed request for an extension of time."[130]  Thus, to the extent Judge Winfield's First Denial Order denies Quad's request for an extension of time, this Court is inclined to agree with Quad that the ruling—in that limited respect—is not final.

---

[125] *See e.g. Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 586, 205 L. Ed. 2d 419 (2020); *Bullard v. Blue Hills Bank*, 575 U.S. 496, 135 S. Ct. 1686, 1694, 191 L. Ed. 2d 621 (2015).
[126] *Ritzen*, 140 S. Ct. at 586 (citing *Bullard*, 575 U.S. 496).
[127] Docket No. 419 at 15.
[128] Docket No. 378 at 3.
[129] Docket No. 419 at 15 (citing *Bullard*, 575 U.S. 496).
[130] *Bullard*, 575 U.S. 496.

However, as the Reorganized Debtor points out, "the First Denial Order did much more than simply deny an extension of time."[131]   In the opinion accompanying the First Denial Order (the "Opinion"), Judge Winfield meticulously addressed the merits of Quad's request for derivative standing and reached a ruling that resolved that discreet issue.  Judge Winfield squarely disposed of the discrete dispute regarding derivative standing within the larger context of the bankruptcy case such that the denial is "final" under the standards set forth in *Ritzen* and *Bullard*. Indeed, this Court's research revealed that the denial of a motion for derivative standing has been treated as a final and appealable order in the Third Circuit.[132]

Quad's second argument against finality is that the denial of its request for derivative standing was not final because "the ultimate disposition of the Actions was left unresolved."[133] However, as the Reorganized Debtor points out,[134] ultimate disposition of the Actions was not at issue in the First Derivative Standing Motion.  Rather, the discreet issue before the Court was whether Quad should be afforded derivative standing to pursue the Actions.   The Court unequivocally resolved that issue and determined that Quad was not entitled to derivative standing. The ultimate disposition of the Actions—i.e., the success or failure of those Actions—is not dispositive as to whether the First Denial Order is final for purposes of res judicata.

Quad attempts to explain that "[t]he issue could have been finally resolved a number of different ways, such as: (a) denial or dismissal of the appeals; (b) dismissal of the bankruptcy case; or (c) conversion of the bankruptcy case."[135]  However, it appears to the Court that Quad conflates

---

[131] Docket No. 420 at 8.
[132] *See e.g.*, *In re Merritt*, 711 F. App'x 83, 88 (3d Cir. 2017) (reviewing denial of motion for derivative standing); *In re Optim Energy, LLC*, 527 B.R. 169, 173 (D. Del. 2015) (conducting *de novo* review of bankruptcy court's order denying derivative standing; *In re Stewart*, No. 10-2654, 2013 WL 4041963, at *2 (W.D. Pa. Aug. 8, 2013) (declining to review denial of motion for derivative standing because litigant failed to appeal the ruling).
[133] Docket No. 419 at 16.
[134] Docket No. 420 at 8.
[135] Docket No. 419 at 16.

"the issue" to which it refers.  As discussed above, it is evident from the record that "the issue" that was considered and resolved in Quad's First Derivative Standing Motion was whether Quad should be granted derivative standing to pursue the Actions.  Thus, the subsequent outcome of an appeal, or dismissal or conversion of the case is irrelevant to Court's ruling on the limited issue of derivative standing.

Quad additionally relies on the fact that in denying the First Derivative Standing Motion, Judge Winfield stated that "it cannot now be predicted whether or when the confirmation order will be reversed" and "it cannot now be discerned whether the case would remain in chapter 11."[136] Quad contends that First Denial Order "was not the equivalent of the Bankruptcy Court determining that if the appeals were successful and the Actions could be brought, Quad was forever barred from filing any motions with respect to the Actions even if the Reorganized Debtor did nothing to pursue the Actions."[137]  However, this Court concludes that a bar to derivative standing was precisely what was intended by the First Denial Order, and Quad's argument ignores the remainder of Judge Winfield's Opinion.  The Third Circuit recently admonished a litigant under similar circumstances in *In re Washington Mutual, Inc.*[138]  In that case, as here, the litigant ignored an independent basis for the bankruptcy court's decision.  The Third Circuit explained that the litigant "cannot credibly dismiss [those] conclusions as judicial musings."[139]  Likewise, Quad cannot credibly overlook the other valid holdings in Judge Winfield's First Denial Order.  Like the bankruptcy court in *In re Washington Mutual*, Judge Winfield analyzed the merits of the issue before her at length.  Judge Winfield issued a thorough and substantive opinion in which she

---

[136] Docket No. 386 at 9.
[137] Docket No. 419 at 16.
[138] *In re Washington Mut., Inc.*, 835 F. App'x 667 (3d Cir. 2021).
[139] *Id.* at 669 (quotations omitted).

addressed Quad's arguments and the legal standard for derivative standing.[140]  Ultimately, Judge

Winfield concluded that Quad fell far short of "demonstrating that it has colorable claims"—a

necessary element to establishing entitlement to derivative standing.[141]  This Court views Judge

Winfield's comments regarding the uncertain future of the bankruptcy case as independent reasons

supporting her decision; a cherry on top of an already solid and substantive basis for denial.[142]

The discreet issue in the First Derivative Standing Motion—Quad's request for derivative

standing—was addressed on the merits and decided.  Quad failed to appeal or otherwise challenge

this ruling.  Accordingly, it is final for purposes of res judicata.

At this point, the Court wishes to clarify that the district court's Remand Order does

nothing to alter this Court's analysis regarding the finality of Judge Winfield's First Denial Order.

In her Opinion, Judge Winfield examined "the existence of a colorable claim that would benefit

the estate based on [a] cost-benefit analysis performed by the court."[143]  Judge Winfield proceeded

to consider the evidence in the record and, in her analysis, she referenced the "mini-trial" she

conducted on valuation as part of the confirmation hearing.[144]  In the Remand Order, the district

court determined that the Bankruptcy Court erred as a matter of law in approving third-party

releases by failing to analyze the contributions made by the non-debtors in exchange for the

releases.[145]  Accordingly, the district court overturned the Bankruptcy Court's approval of the

releases.[146]  During oral argument on the instant Motion, counsel for Quad argued that the district

court's Remand Order likewise overturned Judge Winfield's reasoning in the First Denial Motion.

---

[140] Docket No. 386.

[141] Docket No. 386 at 7 (citing *In re Gibson Grp., Inc.*, 66 F.3d 1436 (6th Cir. 1995)); *see also In re G-I Holdings*, 313 B.R. 612 (setting forth elements to be shown to warrant derivative standing).

[142] *See In re Washington Mut., Inc.*, 835 F. App'x 667.

[143] Docket No. 386 at 7 (citing *In re Gibson*, 66 F. 3d at 1146).

[144] Docket No. 386 at 8.

[145] Docket No. 399-1 at 13.

[146] *Id.*

Specifically, Quad posited that because a cost-benefit analysis is an enumerated factor in analyzing both a motion for derivative standing and a motion for approval of a release, and because the district court determined that Judge Winfield's ruling with respect to the releases was flawed, so must her ruling with respect to derivative standing be flawed. Quad's argument fails for two reasons.

First, as noted previously, Quad failed to appeal Judge Winfield's ruling denying its request for derivative standing. Therefore, that issue was never before the district court for review. Specifically, the district court did not review the First Denial Order and Opinion nor ever determined that any errors were made. This Court cannot, and will not, *sua sponte* revisit a prior order where there is no basis to do so.

Second, although both a request for derivative standing and for approval of a release require consideration of many of the same factors, including a cost-benefit analysis, they are two distinct and separate concepts. In the derivative standing context, a court is tasked with determining whether a debtor or trustee has unjustifiably refused to bring an action to enforce a colorable claim. Courts have instructed that the focus of inquiry should be on the probability "of legal success and financial recovery in [the] event of success."[147] "While a court need not undertake a 'mini-trial' to determine the likelihood of success in such a suit, a court 'should assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce.'"[148] This was the inquiry undertaken by Judge Winfield in her Opinion denying the First Derivative Standing Motion.

---

[147] *In re G-I Holdings*, 313 B.R. at 629 (citing *In re STN Enterprises*, 779 F.2d 901, 905 (2d Cir. 1985)); *see also In re Gibson Grp.*, 66 F.3d at 1438 (cited by Judge Winfield in the First Denial Order).
[148] *Id.* (quoting *STN Enterprises*, 779 F.2d at 905–06)).

In contrast, as discussed by the district court in the Remand Order, courts consider a different set of factors when considering releases of claims against non-debtors, including, but not limited to: (1) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) substantial contribution by the non-debtor of assets to the reorganization; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.[149]

The district court's Remand Order took issue with only one aspect of the Bankruptcy Court's opinion approving the releases: that the Bankruptcy Court did not "analyze the contributions made to the Plan by the released non-debtors."[150]  However, "what" and "if" a third-party non-debtor contributes in exchange for a release is an analysis separate and apart from "how" and "whether" pursuit of a claim benefits the estate for purposes of determining derivative standing.  Often, debtors-in-possession and/or trustees make the decision not to pursue claims where no releases are given to third-parties.  In those circumstances the derivative standing analysis is conducted, very obviously, without any consideration as to what a third-party non-debtor contributed.[151]  Ultimately, while this Court recognizes that a request for derivative standing and request to approve a release require consideration of many of the same factors, they are not exactly the same.  Instead, they implicate two distinct tests.

---

[149] Docket No. 399-1 at 10 (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999)).
[150] Docket No. 399-1 at 15.
[151] *See, e.g. In re G-I Holdings*, 313 B.R. at 629 (no release given).

Further, in the Remand Order the district court noted that the Bankruptcy Court considered "the value of the claims, the cost to pursue the claims, the likelihood of success in pursuing the claims, and the ability to collect if the claim was successfully pursued."[152]  The district court found no error in the Bankruptcy Court's analysis as to those factors.  Instead, the district court explicitly limited its holding to find that the Bankruptcy Court "erred as a matter of law in approving the releases by failing to analyze the contribution made by the non-debtors to the Plan in exchange for the releases."[153]  Quad does not allege in its briefing—and this Court's independent research does not reveal—that contribution in exchange for a release is a necessary component of the derivative standing analysis.  Therefore, there is nothing in the Remand Order to suggest that Judge Winfield's ruling in the First Denial Order was overturned by the district court.

In sum, to the extent that Quad believed that the rulings in the First Denial Order were incorrect or that the Bankruptcy Court erred in its analysis as to the issue of derivative standing, Quad could have—and should have—filed a motion to alter or amend judgment or an appeal of that decision.  Quad failed to do so.  Moreover, to the extent that Quad means to argue that the errors identified by the district court in the Remand Order somehow also invalidate rulings contained in the First Denial Order, this Court notes that Quad failed to adequately brief this issue.  But, even so, and as discussed above, the record and case law do not support Quad's position.  This Court finds that Quad had ample opportunities to raise this issue:  during the course of its appeal; in opposition to the motion which resulted in the Final Decree; during negotiation of the Consent Order on Remand; or in an appropriate submission to this Court in the 428 days between the date the district court issued the Remand Order and the date Quad filed the instant Motion.  Quad took no action to avail itself of its opportunities.

---

[152] Docket No. 399-1 at 11 (citing *Fourth Amended Disclosure Statement*, Docket No. at 19).
[153] *Id.* at 12.

### b.  Same Cause of Action

Quad also argues that the second requirement for res judicata is not met because the instant Motion is not a subsequent suit based on "the same cause of action."[154]  Quad's argument in this respect can be divided into several parts.  First, Quad again characterizes the First Derivative Standing Motion as an "Extension Motion" seeking to "extend the time period in section 546(a)(1)(A);" whereas the present Motion, according to Quad, is a motion to reopen the case under § 350 of the Code to administer assets.[155]  Quad's reasoning is somewhat misguided in this respect.  As detailed above, a necessary part of the analysis in addressing a motion to reopen under § 350 is an examination of the futility of the underlying purpose for which the case is being reopened.[156]  Quad cannot side-step res judicata by omitting from its current Motion an aspect of a prior ruling that precludes the relief it seeks through the Motion to Reopen.  However, the Court need not make a determination as to the application of res judicata to the time extension rulings made in the First Denial Order because this Court already addressed, and disposed of, the statute of limitations issue.  No further analysis is warranted.

Significantly, the second part of Quad's argument acknowledges that "the same law [applied in the First Derivative Standing Motion] may apply to [the] derivative standing portion of the [instant] Motion."[157]  However, Quad posits that its "claims [in the instant Motion] are entirely different than [those in] the [First Derivative Standing Motion] and will require the Court to determine if there is cause to reopen the case, the proper disposition of the unadministered assets and who should be responsible for the disposition of the unadministered assets."[158]  This argument

---

[154] Docket No. 419 at 17.
[155] *Id.*
[156] *See., e.g.*, *Reinert*, 620 B.R. at 543 ("A bankruptcy case should not be reopened where it would be a futile exercise or a waste of judicial resources." (citing *Redmond*, 624 F.3d at 803).
[157] Docket No. 419 at 17-18.
[158] Docket No. 419 at 18.

is without merit.  The Court reiterates that in assessing the Motion to Reopen—or, as Quad puts it: "if there is cause to reopen the case"—the Court must also examine the purpose for which the case is being reopened, which is for Quad to gain derivative standing.  Accordingly, the Court must examine the merits of Quad's request for derivative standing which, in turn, implicates the same analysis undertaken by Judge Winfield in disposing of the First Derivative Standing Motion. Indeed, Quad concedes that the "same law may apply."[159] The fact that the Motion to Reopen may require consideration of other issues, in addition to the question of the appropriateness of derivative standing, does not negate the fact that the instant Motion presents the same issue—a request for derivative standing—as was presented in the First Derivative Standing Motion.  Even accepting Quad's allegation that resolution of the instant Motion requires additional determinations such as "the proper disposition of the unadministered assets and who should be responsible for the disposition of the unadministered assets," res judicata remains applicable.[160]  Therefore, the Court never considers Quad's additional factors because res judicata applies.

Finally, Quad argues that the claims it brings in the instant Motion "did not exist nor could they be brought at the time of the [First Derivative Standing Motion]."[161]  Quad explains that, at the time it filed the First Derivative Standing Motion, the releases and injunctions contained in the Confirmation Order precluded anyone from bringing the Actions.  However, Quad conflates the claims of the Actions themselves, with the issue of derivative standing.  Indeed, all parties— including Quad—were precluded from pursuing the Actions at the time of the First Derivative Standing Motion.  However, the Actions themselves were not what was decided in the First Denial Order.  Likewise, the Actions themselves are not what the Court is asked to resolve by way of this

---

[159] Docket No. 419 at 17-18.
[160] Docket No. 419 at 18.
[161] Docket No. 419 at 18.

Motion.  Rather, the issue decided in the First Derivative Standing Motion, which is the exact same issue presently before the Court, is whether Quad should be afforded derivative standing to pursue those Actions.  Clearly, the issue of derivative standing was already briefed, argued, and decided when Judge Winfield ruled on the First Derivative Standing Motion.

For the foregoing reasons, the Court concludes that the third requirement for res judicata is satisfied in this case.[162]  Namely, the "cause of action" asserted in the First Derivative Standing Motion—the request for derivative standing—is the same cause of action asserted in the instant Motion to Reopen.  This conclusion is further supported by the proposed Orders submitted by Quad in connection with both motions.  The Court observes that both proposed orders are nearly identical, and both seek a finding in Paragraph Two that "Quad/Graphics, Inc. is hereby granted derivative standing to pursue actions on behalf of the Debtor's estate and creditors."[163]

Having found that all elements of the doctrine are satisfied, this Court determines that res judicata bars Quad's request for derivative standing.  Because Quad cannot obtain the substantive relief, which it intends to seek after the case is reopened, there is no reason to grant the Motion.[164]  Although Quad's Motion can be denied on this basis, the Court will address additional issues raised in the parties' submissions.

### 3.  Collateral Estoppel

"Collateral estoppel, or issue preclusion, refers to the effect a prior judgment has in foreclosing a party from relitigating issues of fact that were determined in a prior court proceeding."[165]  The Third Circuit stated that "[t]he prerequisites for the application issue preclusion are satisfied when: '(1) the issue sought to be precluded [is] the same as that involved

---

[162] *Id.* (citing *Mullarkey*, 536 F.3d at 225) (further citations omitted); *Duhaney*, 621 F.3d at 347.
[163] *Compare* Docket No. 378-1 at 2, ¶ 2; *with* Docket No. 409-3 at 2, ¶ 2.
[164] *See, e.g.*, *Reinert*, 620 B.R. at 543 (citing *Redmond*, 624 F.3d at 803).
[165] FEENEY, WILLIAMSON, STEPAN, 1 BANKRUPTCY LAW MANUAL § 2:29 (5th ed.).

in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and

valid judgment; and (4) the determination [was] essential to the prior judgment.' "[166] Here, Quad

asserts that collateral estoppel does not apply because: (1) the First Denial Order was not a valid

final judgment; (2) the issues in the First Derivative Standing Motion are not identical to those

presented in the instant Motion; and (3) facts essential to the prior judgment have changed.[167]

Quad's first argument is unavailing. For reasons previously discussed, the Court

determines that the First Denial Order is, in fact, a final order and no further discussion is

warranted.

Likewise, in the context of the res judicata analysis above, this Court determined that the

issue addressed in the First Derivative Standing Motion is identical to that presented in the instant

Motion. The Court sees no need to reiterate the basis for that conclusion as it pertains to issue

preclusion. However, for purposes of completeness, the Court will address specific arguments

raised in Quad's brief. Quad first asserts that "the issue the Court considered [in the First

Derivative Standing Motion] was whether there was a cost/benefit of pursuing the Actions rather

than releasing the Actions as part of the Plan."[168] Now, however, Quad contends this Court must

"only consider[] whether there is a cost/benefit of pursuing the Actions."[169] In other words, Quad

argues that the issue before the Court in the First Derivative Standing Motion had the added

complication of the releases whereas that aspect is absent from the issue presented in the instant

Motion. However, as set forth above, consideration of releases is not an integral part of the test

for derivative standing. For reasons already discussed, the Court finds that the same issue

---

[166] *Peloro v. United States*, 488 F.3d 163, 174–75 (3d Cir. 2007) (quoting *Burlington Northern Railroad Co. v. Hyundai Merch. Marine Co.*, 63 F.3d 1227, 1231–32 (3d Cir. 1995) (internal quotations and citations omitted)).
[167] Docket No. 419 at 19-23.
[168] Docket No. 419 at 20.
[169] Docket No. 419 at 21.

addressed in the First Derivative Standing Motion—whether or not Quad was entitled to derivative standing—is presently before this Court.  The fact that the releases have since been invalidated does not change the fact that the issue addressed by the First Denial Order is the same issue currently before the Court.

Quad also attempts to distinguish the issues considered then and now by asserting that this Court must now make a determination as to whether the Actions are time barred—an issue which was not addressed in the First Derivative Standing Motion because the statute of limitations had not yet expired when that motion was filed.[170]  This Court has already ruled on the statute of limitations issue and, therefore, declines to address any further arguments pertaining to the time limitations in this case.  Moreover, the issue of the timeliness of the Actions is not relevant to the more substantive question here, which is whether the issue of Quad's derivative standing was previously addressed in the First Denial Order.  This Court reiterates that it was.

Quad further contends that the factual circumstances of this case have changed so as to preclude application of collateral estoppel.  Indeed, case law mandates that, even if the elements of collateral estoppel are otherwise satisfied, "collateral estoppel is inappropriate if facts essential to the earlier litigated issue have changed."[171]  Quad alleges that the facts of this case have changed in three respects.  First, Quad states that the releases and injunctions, which it contends were essential to the Court's cost/benefit determination, have now been severed from the Plan.  This Court rejects this argument and reiterates that consideration of releases is not an essential element of the derivative standing analysis.  The Third Circuit stated that "where the changed circumstances are not material, and therefore do not amount to controlling facts, collateral estoppel

---

[170] Docket No. 419 at 21.

[171] *Raytech Corp. v. White,* 54 F.3d 187, 190 (3d Cir. 1995) (citing *Montana v. United States,* 440 U.S. 147, 99 S. Ct. 970, 59 L.Ed.2d 210 (1979)).

remains applicable."[172]  Quad attempts to pin the outcome of the cost/benefit analysis in the First

Denial Order entirely on the fact that the Actions were released in the Plan.  This characterization

ignores the findings made by Judge Winfield that were wholly independent of the Plan—such as

her finding that Quad's expert was not persuasive as to the value of the Actions, or her finding that

Quad had not adequately considered the costs of pursuing the Actions, including time and litigation

risks.  Moreover, Quad's position ignores the bigger picture.   In her Opinion, Judge Winfield

examined the totality of the circumstances in her cost/benefit analysis and found that Quad failed

to demonstrate that pursuing the Actions would benefit the estate and that there were "no facts that

weigh in favor of granting Quad derivative standing."[173]   Accordingly, this Court finds that the

releases were not so critical to Judge Winfield's ruling as to preclude application of collateral

estoppel.

Quad's remaining arguments fail for similar reasons.  The Third Circuit has cautioned

against broad application of the "changed factual circumstances" exception to collateral estoppel,

commenting that "[r]are would be the case in which counsel could not conjure up some factual

element that had changed between adjudications."[174]  Indeed, Quad has conjured up the costs of

litigation as an alleged changed fact, and Quad now contends that it will absorb costs of litigation.

However, this "fact" was within Quad's control at the time it filed the First Derivative Standing

Motion, and it could have been raised at that time.[175]  And to reiterate, Judge Winfield found that

---

[172] *Scooper Dooper, Inc. v. Kraftco Corp.*, 494 F.2d 840, 846 (3d Cir. 1974); *see also, Ramallo Bros. Printing v. El Dia, Inc.*, 490 F.3d 86, 91 (1st Cir. 2007); 18 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 4417 (3d ed.) ("The possibility that new facts may surround continuation of the same basic conduct should not defeat preclusion unless it is shown that the new facts are relevant under the legal rules that control the outcome.").

[173] Docket No. 386 at 9.

[174] *Scooper Dooper*, 494 F.2d at 846.

[175] *Lang v. Pennsylvania Higher Educ. Assistance Agency*, 201 F. Supp. 3d 613, 625 (M.D. Pa. 2016) (citing *Latin American Music Co. Inc. v. Media Power Group, Inc.*, 705 F.3d 34, 42 (1st Cir. 2013) ("Although changes in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues . . .

there were "no facts that weigh in favor of granting Quad derivative standing."[176]   Accordingly, this Court determines that Quad's newfound generosity in offering to pay for the costs of litigation is not a controlling fact that renders collateral estoppel inapplicable.

Finally, Quad asserts that Judge Winfield's decision in the First Denial Order was "based on the fact that the releases and injunctions were subject to a pending appeal."[177]   Quad contends that "[t]he facts in support of this Motion are different because the appeal has been decided and the releases and injunctions in the Plan have been invalidated."[178]   The Court rejects this argument for reasons previously discussed and declines to repeat its rationale in detail here.   In brief, Quad's argument ignores the other findings in Judge Winfield's Opinion, which did not rest solely on the pending appeal or the releases.   Thus, resolution of the Appeal and the invalidation of the releases does not preclude application of the collateral estoppel doctrine.

### 4.   Law of the Case Doctrine

The Reorganized Debtor further asserts that the law of the case doctrine bars the Court from granting the relief requested in Quad's Motion.   The Supreme Court described law of the case doctrine as "an amorphous concept."[179]   "As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."[180]   Quad contends that law of the case doctrine does not apply in this case because: (1) this Motion does not present the same issues as the First Derivative Standing Motion; (2) the facts are materially different from those considered in the First Derivative Standing Motion; and (3) the issues and arguments of this Motion could not have been raised in

---

a party cannot circumvent the doctrine's preclusive effect merely by presenting additional evidence that was available to it at the time of the first action.") (internal quotation marks omitted)).

[176] Docket No. 386 at 9.
[177] Docket No. 419 at 22.
[178] Docket No. 419 at 22-23.
[179] *Arizona v. California*, 460 U.S. 605, 103 S. Ct. 1382, 75 L.Ed.2d 318 (1983).
[180] *Id.* (cited in *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009)).

the First Derivative Standing Motion.[181]  Quad concedes that these are the same arguments it presented in arguing against application of collateral estoppel.[182]

Finally, Quad reminds the Court that application of the law of the case doctrine is discretionary.[183]  This Court agrees.[184]  However, Quad failed to present any viable reason why this Court should, in its discretion, decline to adhere to the law of the case here.  Although courts have the power to revisit prior decisions in certain circumstances, the Supreme Court has cautioned against so doing—advising that "as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.' "[185]  Those extraordinary circumstances are lacking in this case.  Judge Winfield addressed the merits of Quad's request for derivative standing and issued a ruling denying derivative standing in the First Denial Order.  That ruling stands and, as set forth above, this Court finds that Quad failed to show good cause to disturb it.

As to Quad's final argument against application of law of the case doctrine, "Quad submits that the law of the case doctrine would only require this Court, in its discretion, to apply the applicable law set forth in the opinion on the [First Derivative Standing Motion] and does not preclude the Court from considering the merits of the [instant] Motion."[186]  Presumably, Quad is arguing that law of the case mandates application of the same law that was applied in the First Denial Order but does not preclude reconsideration of Quad's request for derivative standing.  To the extent this is Quad's argument, it misunderstands the doctrine.  "The doctrine is designed to

---

[181] Docket No. 419 at 24.

[182] *Id.*

[183] *Id.*

[184] *Lambert v. Blackwell*, 387 F.3d 210, 237 (3d Cir. 2004) (citing *Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997) ("In other words, the law of the case doctrine does not limit a federal court's power, rather it directs its exercise of discretion.").

[185] *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 817, 108 S. Ct. 2166, 100 L.Ed.2d 811 (1988) (quoting *Arizona*, 460 U.S. at 618 n.8).

[186] Docket No. 419 at 25.

protect traditional ideals such as finality, judicial economy and jurisprudential integrity."[187] "Law of the case rules have developed 'to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit.' "[188]  Thus, unless extraordinary circumstances exist, law of the case operates to preclude reconsideration of legal issues already decided.[189] Because the circumstances presented here are not extraordinary, law of the case prevents this Court from reconsidering Judge Winfield's denial of the First Derivative Standing Motion.  For reasons previously discussed, the Court finds Quad's arguments unavailing and no further discussion is warranted.

### 5.  Additional Arguments

In their extensive briefing, the parties raised multiple arguments in favor of, and against, reopening this case.  In the previous sections, this Court addressed the arguments that were dispositive of the issues presented.  Accordingly, any issues raised in the parties' submissions that the Court declined to discuss above are immaterial to the outcome of this Motion.   Nevertheless, in the interests of completeness, the Court will briefly address certain remaining arguments.

### a.  Rule 60(b)

Quad asserts that, "[e]ven if any preclusive doctrines applied or the [First Denial Order] was considered final, Federal Rule 60(b) permits this Court to relieve Quad from the Extension Order and grant the relief requested by Quad in this Motion."[190]  As the Reorganized Debtor points out,[191] Quad's Motion did not request relief under Rule 60(b) of the Federal Rules of Civil

---

[187] *In re City of Philadelphia Litig.*, 158 F.3d 711, 717–18 (3d Cir. 1998) (citing *Christianson,* 486 U.S. at 816); *Arizona,* 460 U.S. at 618–19.

[188] *Casey v. Planned Parenthood of Se. Pa.,* 14 F.3d 848, 856 (3d Cir. 1994) (quoting 18 CHARLES A. WRIGHT, ARTHUR R. MILLER, EDWARD COOPER, FEDERAL PRACTICE AND PROCEDURE § 4478 at 788 (2d ed. 1981)); *In re Pharmacy Benefit Managers*, 582 F.3d at 439.

[189] *See, e.g. In re City of Philadelphia Litig.*, 158 F.3d at 718.

[190] Docket No. 419 at 25.

[191] Docket No. 420 at 16.

Procedure.[192]  Accordingly, this Court will not engage in further analysis.  Moreover, to the extent this Court has authority to reconsider the final order issued by Judge Winfield, this Court declines to do so for the reasons previously discussed.

### b.  Whether the Reorganized Debtor or Some Other Entity Owns the Actions

In the Order Continuing the Motion to Reopen, the Court directed Quad to brief the issue of who owns the Actions it seeks derivative standing to file.[193]  Quad's submissions fail to adequately answer this question.  In the lone paragraph Quad devotes to this subject, Quad cites to a Third Circuit case with a different fact pattern and procedural posture.[194]  Quad baldly concludes that "any recovery on the Actions under state law belong[s] to creditors."  Quad's arguments do nothing to alter this Court's conclusions.[195]

### c.  The New Releases and Settlement Agreements

In the Order Continuing the Motion to Reopen, the Court directed the Reorganized Debtor to file a Memorandum of Law outlining its position regarding the effect any releases issued by the Reorganized Debtor have on reopening the estate and the cost/benefit analysis.[196]  In its submission, the Reorganized Debtor explains that Quad seeks derivative standing to pursue claims against its former employees, Bruce and Joanne Heverly (collectively, the "Heverlys"), and Asset Holding Corporation ("AHC"), a company from which the Reorganized Debtor leased certain equipment.[197]  Apparently, after confirmation of the Plan, disputes arose between the Reorganized

---

[192] Federal Rule of Civil Procedure 60(b) is made applicable to the Bankruptcy Court under Federal Rule of Bankruptcy Procedure 9024.
[193] Docket No. 416, ¶ 1.
[194] Docket No. 419 at 27 (citing *In re Cybergenics Corp.,* 226 F.3d 237, 241 (3d Cir. 2000)).
[195] The Court additionally notes that in a later submission Quad appears to concede that the Reorganized Debtor owns—or at least has the authority to pursue—the Actions.  Quad states, "It was not until after [the Appeal] and entry of [the Consent Order on Remand] . . . that *the Reorganized Debtor had the authority to settle, pursue and enforce the Insider Causes of Action*." Docket No. 421 at 15 (emphasis added).
[196] Docket No. 416, ¶ 3.
[197] Docket No. 418.

Debtor and the Heverlys and AHC.  The Reorganized Debtor resolved those disputes in an agreement (the "Settlement Agreement") wherein the Reorganized Debtor "provided a general release to the Heverlys and AHC from all known and unknown claims it had or may have had against them."[198]  The Reorganized Debtor asserts that the Settlement Agreement is binding as to all parties and precludes the Actions that Quad seeks derivative standing to file.

In response, Quad asserts that the releases have no impact on the cost/benefit analysis.[199] Quad contends that, even if the Settlement Agreement released claims against the Heverlys and AHC, claims remain against other insiders, which satisfy the cost/benefit analysis.  Quad specifically refereces claims against Richard Brammer and Amie and Joe Desanzo.[200]  Quad further argues that this Court should not consider any releases because the redacted Settlement Agreement is inadmissible.

The Court will not go into detail.  For reasons previously discussed, the Court declines to revisit Judge Winfield's determination regarding derivative standing and the cost/benefit analysis. The parties' arguments with respect to the releases and the Settlement Agreement do nothing to change this Court's prior conclusions.

Moreover, in the Order Continuing the Motion to Reopen the Court tasked the parties with discussing the releases' potential effect on *both* the cost/benefit analysis *and* the reopening of the estate.[201]  As detailed above, an inquiry into futility is a critical part of the motion to reopen analysis.  However, Quad's submission focuses almost entirely on the cost/benefit analysis.  While Quad asserts that its claims against Richard Brammer or Amie and Joe Desanzo would not be futile, Quad fails to adequately explain why the releases would not preclude actions against the

---

[198] *Id.* at 4.
[199] Docket No. 421.
[200] *Id.* at 4-8.
[201] Docket No. 416 at 3, ¶ 3, 4.

43

Heverlys or AHC.  Instead, Quad argues that the Settlement Agreement, itself, is inadmissible because it is significantly redacted.  Quad's arguments that the releases may not be valid or enforceable or that the claims against the Heverlys or AHC could not be released "as a matter of law" are not persuasive.  Quad fails to meet its burden of establishing that the Actions it seeks derivative standing to bring would not be futile in light of the releases, which weighs against reopening the case.

### III.    Equitable Considerations

Finally, this Court addresses the fairness of its decision.  Throughout its submissions, Quad argues that it would be unfair to bar these Actions "after Quad's extensive, costly, and time consuming efforts to preserve these Actions."[202]  However, Quad cannot argue around the fact that it failed to preserve its rights.  In the First Derivative Standing Motion, Quad explained that it sought "an order *granting Quad derivative standing to pursue actions* released under the Plan *to the extent Quad is successful on the pending appeals*."[203]  Thus, Quad recognized that it had two hurdles to overcome before it could file the Actions: (1) Quad had to obtain derivative standing; and (2) Quad had to be successful in the Appeal.  Judge Winfield denied Quad's request for derivative standing in the First Denial Order.  Quad then made the conscious and strategic choice not to appeal or otherwise challenge that decision.  Instead, Quad continued with the Appeal—which still included a challenge to the releases—without having obtained derivative standing necessary to pursue the Actions if Quad was successful in its Appeal.

Ultimately, the propriety of the releases was the only issue that was remanded to this Court.  At no point did the district court consider derivative standing or review Judge Winfield's First Denial Order.  Further, the district court did not direct this Court to make any inquiry or review

---

[202] Docket No. 419 at 11.
[203] Docket No. 378 at 3, ¶ 12 (emphasis added).

with respect to derivative standing or the First Denial Order. Accordingly, Quad has no basis to credibly assert that the issue of derivative standing is still open for debate.

Admittedly, the district court's invalidation of the releases created the possibility that an interested party could now bring the Actions. However, the newfound ability to bring the Actions could only exist for a party who took active steps to protect its right to do so. The invalidation of the releases was not the equivalent of a "get out of jail free card" to be used whenever desired. Rather, the ability to bring the Actions remained subject to time constraints and prior court rulings. Those are the rules of litigation, which do not allow for surprises and establish and even playing field for all involved.

At the end of the day, Quad cannot ignore the fact that it previously sought derivative standing and an extension of the statute of limitations. After being denied these requests, Quad chose not to pursue those avenues further. The Remand Order does not provide Quad a second bite at the apple on issues already decided. The district court's invalidation of the discreet issue of the releases does not also invalidate an entirely separate order regarding derivative standing and statutes of limitations, which was supported by independent reasons. Likewise, the Remand Order does not revive or renew Quad's ability to make these requests. Quad failed to protect its rights. In the years that passed, all other parties relied on the unchallenged Bankruptcy Court orders. Accordingly, equity demands that this Court deny Quad's motion.

## **CONCLUSION**

The contentious relationship between Quad and the Reorganized Debtor is evident in this case's extensive litigation history, both pre- and postconfirmation; and a disagreement about whether to pursue the Actions appears to be at the core of the parties' feud. Notwithstanding the

success of Quad's Appeal, the facts of this case demonstrate that Quad failed to adequately preserve its rights with respect to these Actions.  Quad unreasonably delayed in bringing this Motion and failed to take necessary steps to either challenge Judge Winfield's ruling as to derivative standing or to establish that the request for derivative standing should be considered anew.  In short, Quad presented no reason—legal or equitable—sufficient to reopen this case.

For the foregoing reasons, the Court finds that Quad's Motion to Reopen is untimely pursuant to Paragraph Two of the Final Decree.  Moreover, the Court determines that reopening the case is not warranted because the Actions are barred by the applicable statute of limitations and equitable tolling is not appropriate under the factual circumstances presented.  Finally, the Court holds that reopening is inappropriate because the relief Quad seeks by way of this Motion is otherwise precluded by the doctrines of res judicata, collateral estoppel, law of the case, and equitable considerations.

Accordingly, Quad's Motion is DENIED.  An appropriate order will follow.

DATED:  April 6, 2021

Honorable Stacey L. Meisel
United States Bankruptcy Judge